# BRETT v. HARLAN & HOLLINGSWORTH CO. 555

JAMES E. BRETT and Others, Plaintiffs, v. THE HARLAN AND HOLLINGSWORTH COMPANY, Defendant.

*Charter party — how construed — demurrage.*

In the construction of charter parties, each must stand upon its own language, and upon the intent of the parties to be gathered therefrom; the intent, if susceptible of ascertainment, must control.

A charter party contained the following words:

"It is agreed that the lay days for loading and discharging shall be as follows (if not sooner dispatched) commencing from the time the vessel is ready to receive or discharge cargo, the captain having given written notice to that effect: Thirty-five running days, Sundays excepted, for loading and discharging. * * * The cargo to be received alongside within reach of ship's tackle, and to be delivered alongside within reach of vessel's tackles on the railroad company's pier at Santos, where she can safely lay afloat. Lighterage, if any be necessary, to be at the expense of consignees. Vessel to haul once only to loading or discharging wharf at her own expense. If required to move a second time charterers to pay towage. * * * Vessel to be allowed free wharfage at Wilmington." It further provided: "Bills of lading to be signed as presented without prejudice to this charter."

In the bills of lading was the statement "Goods to be discharged at Railway Wharf."

*Held,* that under the terms of the charter party, for the compensation provided, the owner of the vessel undertook an employment and a voyage which was not completed until the vessel had secured a berth alongside the railroad company's pier at Santos;

That the voyage was not completed and the lay days did not commence to run until the vessel was permanently berthed at the railway wharf at Santos, and ready to deliver her cargo alongside, within reach of her tackles, on the railway wharf, and until the captain of the vessel had given notice to that effect.

MOTION by the plaintiffs, James E. Brett and others, for a new trial on a case containing exceptions, ordered to be heard at the General Term in the first instance upon the verdict of a jury in favor of the plaintiffs for $233.14, rendered by direction of the court after a trial at the New York Circuit on the 10th day of April, 1894.

*John A. Deady,* for the plaintiffs, for the motion.

*Henry B. B. Stapler,* for the defendant, opposed.

O'BRIEN, J.:

This action is brought by the owners of ·the barkentine *Eleanor M. Williams* to recover from the defendant, the charterer of said

vessel, freight and demurrage due under a charter party. The defendant did not contest the freight money, and for the amount thereof a verdict was directed by the court. Its liability for demurrage was contested, and presents the only question upon this appeal.

Under the charter, the vessel went to Wilmington, Del., loaded there and took a cargo of car material for two railway companies, and sailed thence for Santos, in South America, where she arrived on or about the 6th of February, 1891. On the tenth, the captain of the vessel gave written notice to Hampshire & Co., defendant's agents at Santos and consignees of the cargo, that the vessel was ready to discharge. The agents refused to accept the notice, upon the ground that it could not be given until the vessel had been berthed at the pier or wharf ready to discharge cargo. It is conceded that when such notice was given the vessel was in the stream and there remained until about the twenty-fourth of March, when, for the first time, she reached the railway pier and was berthed ready to discharge the cargo. There she remained only two days, engaged in discharging, when, yellow fever having broken out in Santos, the vessel was ordered to quarantine, where she lay several weeks before again reaching the wharf and discharging the cargo, which latter was completed on the twentieth of June. The testimony shows that there was but one wharf at Santos suitable, by reason of depth of water and size, to afford facilities for discharging, and that this was owned or controlled by the Sao Paulo railway, and was "the railroad company's pier at Santos" mentioned in the charter party. At such railway wharf there were nine berths for vessels of the size of the *Williams*, and it would appear that during the time from the tenth of February to the sixteenth of March, while the vessel was in the stream, there were berths vacant at the railway wharf. No satisfactory explanation is given why, under these conditions, the vessel was not berthed, except that both parties claimed that the duty of procuring a berth rested upon the other; the plaintiffs on the one hand insisting that it was the fault of the defendant, who had control of the pier, and the defendant, that its agents had no such control, and that it was under no obligation under the charter party to procure a berth for the vessel.

The question of fact thus presented, as to whether or not the agents of the defendant had control of the railway wharf, we think

must be resolved in the defendant's favor. The master of the vessel assumed that the defendant's agents were obliged to procure him a berth, and that having control of the pier they should have done so; but beyond this, there is no evidence in the case tending to show that the agents of the defendant, who were the consignees, had any supervision, direction or control of the railway wharf. When the plaintiffs' witnesses were asked the question directly, as to whether Hampshire & Co., defendant's agents, had any control of the pier, they answered that it was called the Sao Paulo Railway pier, but that they did not know whether Hampshire & Co. had any control or anything whatever to do with the pier; and it is conceded that the Sao Paulo railway was not one of the railways for which any portion of the cargo was intended. In the absence of evidence showing that defendant's agents had such control, the fact cannot be assumed, and we cannot proceed to determine the question upon plaintiffs' theory that, having the control and management of the pier, it was the duty of such agents to facilitate and not delay the berthing of the vessel. The question of fact thus disposed of we think important, because if it had appeared that, having the right to determine what vessels should use the pier for the purpose of unloading, they had permitted vessels arriving after the *Williams* (which it appears those who owned the pier did) to unload, thus giving a preference and causing the delay, they would have been, upon the ground that it was due to their default, legally chargeable with demurrage.

This brings us to a consideration of the question of law which must determine the rights of the parties upon this appeal, as to whether, under the contract between the parties, the lay days during which it was agreed the defendant should unload the vessel should commence to run from the time that the vessel arrived in the stream at Santos and gave notice of readiness to discharge, or whether such time only began to run when the vessel was berthed alongside the railway wharf and ready to discharge her cargo.

Upon this subject the charter party says: "It is agreed that the lay days for loading and discharging shall be as follows (if not sooner dispatched), commencing from the time the vessel is ready to receive or discharge cargo, the captain having given written notice to that effect: Thirty-five running days, Sundays

excepted, for loading and discharging. * * * The cargo to be received alongside within reach of ship's tackle, and to be delivered alongside within reach of vessel's tackles on the railroad company's pier at Santos, where she can safely lay afloat. Lighterage, if any be necessary, to be at expense of consignees. Vessel to haul once only to loading or discharging wharf at her own expense. If required to move a second time charterers to pay towage. * * * Vessel to be allowed free wharfage at Wilmington." It further provided: "Bills of lading to be signed as presented without prejudice to this charter."

The charter party then, with the bills of lading, constitute the contract between the parties; but, as seen from the provision just quoted, the bills of lading are subject to the charter party. If resort may be had to the bills of lading upon this question of when the lay days commenced to run there will be found therein this statement: " Goods to be discharged at Railway Wharf." As the bills of lading were, under the charter party, to be made subject thereto, we think the question here presented is to be determined by the construction of the charter party itself, and we are to gather therefrom what were the obligations, respectively, of the parties as to berthing the vessel at the railroad pier. If this obligation was upon the defendant, then clearly upon the vessel's arrival in the stream at Santos, and giving notice of readiness to discharge, the lay days would commence to run, and for any time thereafter occupied the defendant would be liable for demurrage. On the other hand, if the voyage was not completed and the plaintiffs' duty fulfilled until the vessel was permanently berthed at the railway wharf at Santos and ready to deliver her cargo, then the delay that ensued in procuring such berth, unless, as already said, plaintiffs were prevented by the defendant or its agents, the ownership or control of the pier would not make the latter liable for demurrage.

We have been referred to many cases where the construction of charter parties was involved; but as these turn upon the construction of contracts, similar it may be, but not in all respects like to the one here involved, no advantage can be gained from collating and discussing them, thinking, as we do, that, with respect to questions arising upon contracts of this character, just as in the construction of wills or other written instruments, each must stand upon its own

language and upon the intent of the parties to be gathered therefrom, the intent, if susceptible of ascertainment, to control.

By express language the defendant undertook the obligation of providing a berth at the place of loading, and the absence of any express agreement to provide one at the place of discharge is significant. Moreover, the language already quoted from the charter party, showing that at a berth to be provided by the defendant the cargo was to be received by the plaintiffs within reach of ship's tackle, and "to be delivered alongside, within reach of vessel's tackles, on the railroad company's pier at Santos," seems to us clearly to point out that for the compensation provided the plaintiffs undertook an employment and a voyage which was not completed until the vessel had secured a berth alongside the railroad company's pier at Santos.

It will thus be seen that our conclusion agrees with that of the learned trial judge, that under the charter party the voyage was not completed and the lay days did not commence to run until the vessel was permanently berthed at the railway wharf at Santos and ready to deliver her cargo alongside, within reach of her tackles, on the railway wharf, and the captain had given notice to that effect.

It is unnecessary to discuss the question of the defendant's duty in respect to providing lighterage, because the evidence shows that if the cargo had been placed upon lighters the latter would have been required to be berthed at the pier before the cargo could have been delivered to the consignees, and it was not shown that there were any greater facilities for securing a berth for the lighters than there was for procuring a berth for the vessel itself.

We think that the exceptions should be overruled and the motion for a new trial denied, with costs, and a judgment is ordered to be entered upon the verdict as directed.

VAN BRUNT, P. J., and FOLLETT, J., concurred.

Exceptions overruled and motion for new trial denied, with costs, and judgment ordered on verdict.